May it please the court. Chief Judge Smith, members of the court, Mr. O'Connell, I am honored to be here this afternoon on behalf of Ivan and Rhonda Swearingen whose 27 year old son Ryan was shot in a closet of their home in Fort Madison, Iowa in August of 2014 by Fort Madison police officer Carl Judd. The actions were objectively reasonable and granted summary judgment in favor of Officer Judd, Captain James Carle, and the city of Fort Madison Police Department. We're here urging the court to find that viewing the facts of this case in the light most favorable to the Swearingen's and all reasonable inferences in their favor that Officer Judd's actions were not objectively reasonable and that Ryan Swearingen's Fourth Amendment rights against the unreasonable seizure was violated as a result and that the law was clearly established that the Fourth Amendment prohibited Officer Judd's conduct in shooting Ryan Swearingen in the Swearingen home. And what law do you cite specifically for the clearly established prong? I beg your pardon? What law do you cite? Which cases do you say made it clearly established to the officer? Your Honor, the cases that we feel... most persuasive on the clearly established aspect of the case are the Craighead case and the Nance v. Sammas case in which this court found that there is existing case law that an officer must have probable cause to believe that a suspect poses a threat of serious physical harm before using deadly force. I grant that the court has oftentimes said that generalities don't establish a clearly established baseline in which to determine the reasonableness of an officer's use of deadly force, but we believe this is an obvious case where Officer Judd, based on the circumstances that confronted him, would have determined that his use of deadly force against Ryan Swearingen was objectively unreasonable. So we believe that the Craighead case and the Nance case are most persuasive on that point. What do you say are the Sure. The Swearingen family was preparing to go on an outing to a fishing trip. No, I'm talking about just the incident in the closet. Or do we need the background about the trip? Sure. Well, Officer Judd was responding to a call that he'd heard over the radio from James Carl, who said that he was pursuing a subject who he knew to be Ryan Swearingen, who had been popping tires. Right. I think, I don't mean to interrupt you too much, but of course we've read all that, and I just wanted to zero in on what happened when the officer opened the closet door. Sure. And what's undisputed as to what Swearingen was doing, or how he was positioned, and where the knife was, and so forth. Yeah, the disputed facts on that, Your Honor, are really twofold. Number one, where was Ryan positioned in the closet? The facts established that he was not looking at Officer Judd, that he was looking into the kitchen where his father was, and where Officers Riggs and Smilovich were standing with his father. And those facts were established by what Officer Hartman saw, who was immediately behind Officer Judd. Officer Hartman saw and focused his taser on Ryan's left shoulder. Ivan Swearingen saw the left part of his son's torso in the closet. The autopsy results show that the shots that were fired against Ryan struck him in the left upper arm, the left chest, and the left hip. And those shots were going from back to front. So Ryan had to have been turned facing the kitchen away from Officer Judd at the time he was shot. Do the facts show the distance between Ryan and those individuals that you say he was was I beg your pardon? Do the facts in the record show the distance between Ryan and those in the kitchen that you mentioned, the father and the other officers? What that distance was between them? Yeah, the distance between Officer Judd and Ryan in the closet was estimated between two and three feet. Between the closet and the kitchen was a substantially farther distance by probably six to eight feet or six to eight steps. What room were the officers in? Pardon me? What room were the officers in? Officer Smilovich and Officer Riggs were in the kitchen with Ivan. No, I'm talking about the shooter. The shooter was in a laundry room that's inside the back door of the of the Swearingen. And this closet apparently has a door on each side, one on the laundry room side and one on the kitchen side? No, one goes from the laundry room to an adjoining bedroom. It's a walk-through closet. So if you enter from the laundry room into the kitchen into the closet, right? Yes. And then if you come out the other side, what room are you in? To a bedroom. And the kitchen is beyond the bedroom? No, the kitchen is a perpendicular to the hallway that's formed the laundry room. When you open up the closet door, the laundry room is to the left. You look ahead to your right and the kitchen's ahead. And then off to your far right is the bedroom. Could you exit from the closet to the kitchen? You can enter to the the closet from the laundry room, which is next door adjacent to the kitchen. I see. So there's no direct entry from the closet to the kitchen? Not directly, right. When you say that Swearingen was looking at the people in the kitchen, that means he was oriented to the same side of the closet as the laundry room? Yes, and looking out the closet door. Okay, so he was looking out the side that was opening toward the officers. Yes. And was it a sliding door or a pole? It was a door on a hinge that opened out into the laundry room. So as Officer Judd walked by, saw the closet door move, and was told by Officer Riggs, is there somebody in the closet? He pulled the And where was the knife? What is the evidence about where the knife was at the time of the shooting? That's the next disputed fact. From the light most favorable to Swearingen, where was the knife? It would have been held down to the side in Ryan's right hand with the point of the knife up toward his elbow concealed against his forearm. What evidence supports that? Officer Hartman observed him holding the knife like that when Ryan was standing next to the door that goes out to the backyard, and also saw him holding the knife like that when he saw Ryan get shot. Are there any facts that indicate there was danger to the officer who fired the shots or to the other individuals who were present in the kitchen? Yeah, our contention, Your Honor, is that the officers who were in the kitchen were not in danger. They were with Ivan. Officer Carl, who preceded Officer Judd into the house from the back door, said he didn't feel in danger. Officer Judd was the only one who claimed that he had any apprehension of danger to himself. Did he make a claim that he perceived danger to the others who were present? Well, Officer Judd contended that he didn't see any threat toward any of the occupants of the house, including Ivan or Rhonda or the children that were in the house or the sister that was in the house. There was no visible evidence that anybody in the house was in any kind of danger. In fact, Ryan's father, Ivan, was repeatedly asking the officers, do you have a warrant? What are you doing in the house? Rhonda asked what was going on in the house. Nobody asked for any assistance from any of the officers. Nobody claimed that they were in any danger. So why wasn't it reasonable for the officer to believe that he was in danger from the knife? Because we believe, Your Honor, that there's disputed evidence about whether the knife, as it was held by Ryan in the closet, posed any danger to Officer Judd. Moreover, the officers who were in the kitchen, one of whom had a taser pointed at the closet, was prepared to use non-lethal force and could have easily dispatched Ryan without the use of deadly force. So we believe that, first of all, Judd misapprehended what the danger was. It wasn't reasonable for him to believe that he was in imminent danger. No one else in the house was in any imminent danger. There were non-lethal instruments available to ready the situation and make it safe for everybody, regardless of any apprehension of fear or danger of serious injury. What would be your strongest argument against the line of cases that we have that discuss mistaken but reasonable beliefs on the part of officers? Our strongest argument on that, Your Honor, is that there are disputed facts about what that danger was. And we believe that those facts are best reconciled by a jury examining the testimony of the disputed witnesses, the Now, granted, this was a situation that was in flux. We don't dispute that. There was pandemonium in the house. The family had been awakened by a barking dog banging at the back door. So there was all sorts of confusion, obvious. But in taking apart the case, looking at the objective facts, and again viewing those facts in the Swearingen's favor and the inferences from it, it's disputed about what sort of danger Ryan created to Officer Judd. So what I'm hearing you say is that there are really two things that we ought to focus it on. First, the disputed nature of the observations of the officers. And second, the reasonableness of this particular reaction that is shooting. Exactly. And that those are questions that must necessarily rise to the level that they ought to be presented to a jury. Yeah, especially considering the dispute about how the knife was held, and in particular, in view of the autopsy and the officers in the kitchen, about how Ryan was situated in the closet, and whether or not he confronted Officer Judd or presented a problem that Officer Judd felt required deadly force. If we look at the line of cases that talk about the use of force that may be appropriate against persons who are fleeing, and one of the issues are that we should be concerned about the nature of the pursuit in the first place. How do you think that colors this particular case? In our view, Your Honor, Ryan Swearengin was being pursued for a, at potential best, a misdemeanor vandalism of a car. He hadn't created any kind of a threat to any citizens. He ran to a house. The officers knew where he lived. They knew his family there. It was a misdemeanor property offense and not a personal violence. So in view of that, and again based on what Officer Judd knew, based on what he had heard, and the only thing that Officer Judd heard was that somebody was being chased. It was Ryan Swearengin. He was being chased into the Swearengin home, and he'd been seen popping tires. So it was a property crime vandalism that he was being pursued for. Thank you. Thank you, counsel. Mr. O'Connell. Good afternoon. May it please the court, my name is Patrick O'Connell of Lynch Dallas PC, and I represent Officer Carl Judd in this matter, as well as the city of Fort Madison and Captain James Carl. The language used by Justice often forced to make split-second judgments and circumstances, which are tense, uncertain, and rapidly evolving, could not be more applicable to what Officer Judd faced on August 3rd, 2014, when he opened the closet door. What happened when he opened the closet door? He opened the closet door, I'll back up this narrow mudroom. That was somewhat confusing in Mr. Spee's argument a minute ago. There's a narrow mudroom with a washer and dryer on the left and a basically a sheer wall along the right, and this closet door is recessed into this wall. So when Captain Carl first entered, after breaking the glass and proceeded down the hallway, Judd was behind him. All right. Both Captain Carl and Officer Judd were within mere feet of this opening, of which they were not aware. They simply were not aware of the closet until they got into the residence. And what was interesting about this whole, I have to back up a little bit because I want to get to what Officer Judd knew as he was walking forward with this closet on his right, which he was not aware of. He enters the house after having seen Ryan Swearengin flee what he considered to be an ambush position by the back door into the kitchen and disappearing from view through the kitchen. So he's thinking the suspect is back in the house someplace, but he's not. Which office was in first? Well, they were nearly simultaneous, but as they were breaking the glass in the back door, they looked forward and noticed that Smilovich and Riggs were already in the house. And they had been there for some seconds because they had come in the front and they were, at that point, beginning to grapple with Ivan Swearengin, the father. So as they're proceeding into the house, they're focused on this struggle in front of them, and Ryan has disappeared. What's unusual about this fact pattern, and what's frankly frightening for the officers, is that he disappeared out of sight, went through the bedroom, came through the opposite side of the closet, and came in behind them. And that is what precipitated the death of Ryan Swearengin. Well, you get back to my question. What happened when Officer Judd opened the door? He opened the door with his right hand. He testified that he's a left-handed shooter. He opened the door with his right hand. He had the weapon in his left hand, the Glock 40 in his left hand, and immediately saw Ryan with a green knife, which has been described by pretty much everyone as being in his possession, in what he described as a dagger-like position. And he said that what I observed when I opened the door was Ryan looking toward me. He looked to me. Initially, he said he raised up as if to lunge. In his deposition, he said, well, I can tell you for sure he was in a full upright position when I fired. He said, I saw the knife. I saw the green handle. And he looked at me, and I looked at him. And he was specifically asked by Mr. Spies, did you make eye contact? And he said, well, no, but I know I was looking at his face, and he was looking at me. So from the officer's perspective, he believed the knife was in a raised position? He believed the knife was in a raised position. Well, and he said he saw it. Okay, and no question. The knife was in a raised position. Brian was actually facing away from it. He would have been facing toward the front of the house because of the way the hallway is oriented. The door opens in this manner so that it opens toward the kitchen. So when he opened the door, Ryan was facing toward the kitchen. He was looking directly at the back of Officer Carl. So you mean Judd would have seen him in profile? Judd would have seen him more or less from the side, which, you know, none of this is surprising. And this is part of the reason why Judge Gritzner believed these were not material facts in dispute. Because I understand the argument that because he was facing this way, you would have expected that there would have been entry wounds coming from the side with a slightly back to front trajectory because of where Officer Judd was in the hallway. He was abreast of the closet. He said that, consistent with my training, I backed up to give myself space and control over the weapon because the suspect was within two and a half feet of him, and he fired. And you would expect to see a trajectory like that if somebody was facing toward your partner whose back is a mere four or five feet away from a knife wielding suspect. Now he testified, and I want to correct something Mr. Spies said, he clearly said, and he said it numerous times, that the instinct that I had, the thought in my mind was, he's two and a half feet from me with a knife, and I have to defend myself. But he also mentioned that the other officers were right there. He was cognizant of the fact Hartman was behind him, albeit blocked by the door. Okay, and this is one thing that I think is also factually important. Hartman could not see what happened. You know, the notion that Hartman would have seen something different is false. Okay, the only person who saw what Ryan was doing at the time the shots were fired was Officer Judd. Because Hartman testified, frankly, he said, I couldn't see, the door was open in my face, and I had to come around the door. And he specifically said, and I can quote him in the deposition, he said, as I was rounding the door, and my laser is on him, but he's already falling to the ground. Okay, so any notion that there's a disputed issue of material fact about where the knife was is false. That's just absolutely not demonstrated by the record. Okay, where Mr. Spies has attempted to create an issue of material fact is the photograph, which is, there is a photograph actually, that the DCI has of Officer Hartman demonstrating what he saw Ryan doing as he was pacing back and forth inside the house before he entered the house. And he specifically has the knife demonstrated in this fashion with his arm down to the side. Well, and that is the way Ryan was pacing around in the house before they entered the house. That has nothing to do with what Officer Hartman saw at the time of the shooting. He saw nothing at the time of the shooting. That's why he testified that he had to go around it. So by the time he came around, Ryan is already slumping. And he does say, and this is interesting because Mr. Spies asked him a question in the deposition, he said, well, was his arm up or down? Was his arm down? And Hartman specifically says, and this is at appendix 255, quote, as I was, I'm sorry, he says, 254 of the appendix, he says, it would have been, it would have been within my view, not necessarily hand down, but somewhere up above where I could have seen him at some point seeing that blade. Okay, so the only thing that Hartman tells you is that when he came around the door, he saw the blade. It doesn't say that it was down or that it was someplace where Officer Judd couldn't have seen it. You've got two different statements that are seconds apart. Hold on, the District Court says that Hartman demonstrated the holding of the knife that you're talking about both before and immediately after Ryan's encounter with Judd. Is that wrong? Right, I think so. I think Judge Gritzner was confusing the photograph where he was demonstrating the way he had seen him in general carrying the knives around. Because remember, the officers were all looking in the back door for a long time and watching him pace about and in an unresponsive manner. And he, what he was demonstrating in that picture was what the general manner in which he carried the knife around. But it's evident from the deposition testimony that he couldn't have seen that. He didn't see anything because the door was straight in his face. He says he came around the door and obviously the shots had already been fired at that point. You may be only talking a matter of seconds, but what he would have seen two to three seconds later or whatever it was, would have been different than what Officer Judd saw at the moment he fired. And that, it is totally undisputed that Judd was the only person with a vantage point of seeing him with the knife. And he said... Is Judd's credibility disputed? I don't know how it could be because no one's... Well, the plaintiff might say he's lying to justify a retrospect was careless. They could make that allegation and they were asked about that. In fact, Ivan was specifically asked, could you see Ryan's right hand? And he said no. All I could see was his shoulder, his left shoulder. So that shows you that he was at the threshold just like Officer Riggs says. He came from the front of the house. He saw that door start to crack and saw that shoulder. So Ivan says he could see that and that's no he was standing. So how long had Ivan been in the house or how long had the appellee been in the house before he opened the closet door? It would have been a matter of a couple of minutes. He was chased, carrying the knives into the back door, slammed the door in Captain Carl's face and locked it. And then some amount of yelling back and forth between the police took place. I want to say it was two minutes between the time they got to the back door and began saying you need to let us in and the time the shots were fired, roughly. It was very fast. Specifically, how long from the time the officers were in the house was the door in the closet open? It would have been just a matter of a couple of a to traverse from the back door to where the closet was. So the the appellee came directly in and opened the door with his gun in position to protect himself or someone else? He came in, I wouldn't say he directly, he whatever distance at time it took to walk to that closet when he saw it move. So you're talking just a matter of a few seconds. So when you say that was the door coming open or was the door was moving? It was starting to open according to Officer Judd. And so he went to open it more quickly? Right. He saw it move and he thought is someone in there and he pulled the door open. And this would have all been within seconds of entering the back of the residence. So there had been no discussion among the officers about how to approach this suspect or whether to enter. He wasn't under instruction to enter. It just kind of happened. Is that what you're saying? Right. Nobody even knew the closet was there and so there was no plan obviously to go into it. Remember that Ryan disappeared from view and went around in through the bathroom and came through and basically was attempting to come out right where they were entering the house. Which is why all the officers reasonably under the objective facts of this case thought they were being that led them to believe that was his mindset. For instance he was tucked up against the back door with knives at chest level when Officer Judd said to him and this is all in the in the record he said I walked up to the glass I pointed my weapon through there and said you better put those knives down because when we come in there there's a chance you'll be shot. And that was when they broke the glass and Ryan sprinted off into the house still carrying the knives. So Officer Judd's mindset if I mean if we look at the case law that we have in front of us you know we have Morgan and we have Kruger where the officer's mindset is discussed and the things that are in his mind at the time he opens that closet door he's already experienced what he sees to be a dangerous and unusual behavior pattern on the part of Ryan. There was undisputed testimony that he's walking around in the kitchen and I'm gonna quote I'll quote the language used by the appellants counsel. He said he was unresponsive and oblivious. Now when an officer sees an armed person with a knife who is unresponsive and oblivious that's their their words and their citation to the record not mine. He's already thinking this person is already trying to hide behind the door. He's trying to ambush us as we're coming in the house. So as he's heading down the hallway I would urge the court to look at the Morgan case and the Kruger case where the distances were much greater where there was much more time to evaluate the circumstances than what Officer Judd had available to him. All he had was a split second okay that language about split-second and rapidly evolving is as applicable here as it ever was in any case. Do you think the district court based this decision on the assumption that the that Ryan had the knife raised when the door was open or do you think the district court was saying whether it was raised or whether it was down in that position that you displayed earlier is not material? I think I think Judge Gritzner was saying that that those are distinctions without a difference in in our case law. I think that you're saying he you think the district court's ruling is even assuming the knife was held down with the blade pointing up that the force was still justified. I think so and I think that would be in light of the Cook case it'd be hard to see why it would matter as much as the appellants would would like you to think it is. What could I just ask you what page of the appendix is this photograph you were describing and also is there another photograph that shows the closet area that's been described? There are appendix 486 is the is where officer yeah Hartman is depicted and and they would be around in that area of the appendix where the other photographs are. I see them thank you. Thank you your honor. Thank you Mr. Well the dialogue with the court and Appley's council demonstrates just how confusing and disputed these facts really are and granted it wasn't a seamless event but to add further context to the presence of the police at the Swearingen home. Remember when officer Judd first arrived at at the Swearingen home he went to the front of the house. He saw officers Riggs and Smilovich at the front of the house. He went around to the back of the house where officer Carl, Captain Carl was at the back door. Officer Hartman soon arrived went over the side of the house to make sure there was no way for for Ryan to get off the side of the house. So at this point the house was completely surrounded by police officers. Officers Riggs and Smilovich determined that the room light went to where Ryan's dad Ivan was in the kitchen. The kitchen light was on so by the time officers Carl and Judd came in through the back door they both knew that there were police in the in the in the kitchen that Ivan was under control that there were police officers in the kitchen with non-lethal weapons available. Riggs already had his taser focused on the closet. Hartman had his taser out ready to deploy and when when Hartman came around the door the closet door he said he was able to put that taser on Ryan's left shoulder. And again the autopsy results show that Ryan was shot from the back left. The bullets went from his back toward the front. He was facing the kitchen he wasn't facing officer Judd. These are disputed facts that a jury is entitled to resolve on During the warning that officer Judd supposedly gave again it did appear that Ryan was oblivious to that. Ivan never heard the warning about the drop of knives you're gonna get shot. And importantly nobody in the house Riggs, Smilovich, Hartman, Carl or Judd at any point as they entered the house said Ryan show yourself. They knew Ryan Swearingen was in that house. They knew Ryan lived with his family at that There were plenty of alternatives available. The shooting of Ryan Swearingen was unnecessary under Fourth Amendment law. A jury is entitled to decide these disputed facts. Thank you. Thank you Mr. Spies. The court wishes to thank both counsel for the argument you provided to the court this afternoon. The briefing which you've submitted in this case we will take it under advisement, render decisions promptly as possible. Thank you.